IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION


GAIL JORDAN                                                          PLAINTIFF


v.                              NO. 4:14-cv-00068 JTK


CAROLYN W. COLVIN, Acting Commissioner                              DEFENDANT
of the Social Security Administration


<u>MEMORANDUM OPINION AND ORDER</u>


     Plaintiff Gail Jordan ("Jordan") commenced the case at bar by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, she challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon findings made by an Administrative Law Judge ("ALJ").

     Jordan maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole and offers several reasons why, one of which has merit.[1] Jordan maintains that her residual functional capacity was not properly assessed. She maintains that the record was not adequately developed with respect to the limitations caused by her intellectual disability. For the reasons that follow, the Court agrees.

---

[1]
     The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." <u>See</u> <u>Boettcher v. Astrue</u>, 652 F.3d 860, 863 (8th Cir. 2011).

The record reflects that Jordan filed her applications for disability insurance benefits and supplemental security income payments in July of 2011. See Transcript at 114-115. In the applications, she alleged that she became disabled and unable to work in January of 2008 as a result of depression, diabetes, leg problems, and "oxygen treatment." See Transcript at 114-115, 141. As the Commissioner correctly notes, though, Jordan did not allege that she also became disabled and unable to work as a result of an intellectual disability.

Jordan completed a number of documents in connection with her applications for disability insurance benefits and supplemental security income payments. In the documents, she made no mention of any limitations caused by an intellectual disability. See Transcript at 140-148, 169-174, 189-194. She represented, inter alia, that she completed the seventh grade, did not attend special education classes, and completed a certified nursing assistant program in 2007. She also provided an outline of her employment history. See Transcript at 142, 153-160. In the outline, she represented, inter alia, that she had worked from 1996 until 2000 as a cashier/cook at a convenience store and had worked from 2000 to 2008 as a driver for a "chicken catcher company." See Transcript at 142. Jordan's husband also completed a third party function report on Jordan's behalf. See Transcript at 177-186. In the report, he made no mention of her experiencing any limitations caused by an intellectual disability. In fact, he represented, inter alia, that she can pay bills, count change, handle a savings account, and use a checkbook/money order. See Transcript at 182.

-2-

In October of 2011, Jordan was seen by Dr. Steve Shry, Ph.D., ("Shry") for a consultative mental evaluation. See Transcript at 305-307. He noted, inter alia, that she reported a "long history of learning disability" but reported having completed the seventh grade "without a history of special education courses." See Transcript at 305. He estimated her level of intellectual functioning to be in the mildly mentally retarded range and opined that her adaptive functioning is as follows:

A. Claimant reported that she is incapable of handling her own hygiene and dressing without assistance. She reported that she is unable to drive, perform household chores and shop without assistance due to her physical symptoms. Claimant cited difficulty managing her funds and participating in social groups.

B. Claimant was pleasant and rapport was gained easily. She did not appear to be impaired in her ability to communicate and interact in a socially appropriate manner.

C. She could communicate in an intelligible and effective manner.

D. Claimant did not demonstrate difficulty comprehending and carrying out simple tasks only. She may be moderately limited in her ability to cope with the typical demands of basic work like tasks. This appears congruent with her intellectual functioning level.

E. Claimant attended well. Claimant did not seem to be impaired in her ability to attend and sustain concentration on tasks.

F. She does not tolerate frustration well. She may be mild to moderately impaired in her ability to sustain persistence when completing tasks. This may be due to her intellectual functioning level.

G. She did not seem to be impaired in her ability to complete simple tasks within acceptable time frames. She may be moderately impaired in this area if the tasks are complex. This appears congruent with her intellectual functioning level.

-3-

See Transcript at 307. Shry opined that Jordan gave adequate effort and cooperation and no indication of exaggeration. He opined that his findings were a "valid and reliable" indication of her intellectual and adaptive functioning, this despite "[s]ymptom allegations [appearing] to be incongruent with [her] overt presentation" and having laughed and smiled throughout the evaluation. See Transcript at 307.

In November of 2011, Jordan was seen for a psychometric evaluation by Peggy Foster ("Foster"), a licensed psychological examiner, the results of which were adopted by Dr. Sam Boyd, Ph.D., ("Boyd"). See Transcript at 309-311. They recorded her representations that she completed the sixth grade, never repeated a grade but had "all special education classes starting in elementary school," and tried but failed to obtain a GED degree because the classes were too difficult. See Transcript at 309. Foster and Boyd recorded Jordan's work history, which was not entirely consistent with the representations she made in her disability documents. Foster and Boyd also performed WAIS testing and obtained the following scores: verbal IQ of sixty-two, performance IQ of sixty-five, and full scale IQ of sixty-one. The scores placed Jordan in the mildly mentally retarded range of intellectual functioning. Foster and Boyd, though, doubted the validity of the scores, noting that Jordan's poor vision and possible malingering may have contributed to her scores; they also noted that the scores were inconsistent with her educational and developmental background. They observed that a diagnosis could not be given without "valid and reliable information." See Transcript at 311. With respect to the level of her adaptive functioning, they opined the following:

The claimant communicated in an intelligible and effective manner. She had the capacity to relate in a socially adequate manner. Her thought processes seemed clear and logical but concrete. She reported that she lives with her husband and brother-in-law. Claimant first stated that her husband sorts and gives her medication to her but then stated she puts them in a weekly pill box and he double checks it. She reported that she needs assistance with some daily functions due to physical problems because her legs and hips hurt but otherwise can perform most daily functions unassisted. She cooks, cleans, grocery shops and does laundry unassisted. She stated she can not manage a checking account and pays bills with cash or money order. She reports having a valid driver's license and read the test herself. During this evaluation she demonstrated the ability to attend and sustain concentration on basic tasks and persist until completion but worked at a slow pace. She denied any problem with the legal system or substance abuse.

See Transcript at 311.[2]

Jordan testified during the administrative hearing. See Transcript at 31-49. She testified that she has difficulty performing mathematic calculations, specifically, counting change correctly. She acknowledged that she had worked in the past as a cashier but noted that she only did so on a part-time basis. Jordan's attorney asked Jordan how she was able to work as a cashier despite having only a sixth grade education and having taken special education classes. Jordan answered, "… I had help with the register, because I have problems counting the money back, and they helped me with that." See Transcript at 33.

_____

[2]

In November of 2011, Dr. Winston Brown, M.D., ("Brown") reviewed Jordan's medical records and completed separate psychiatric review techniques. See Transcript at 313-326, 327-341. He opined, inter alia, that she does not have a severe mental impairment, although he also appears to have noted that there was "insufficient [medical evidence of record] at [her date last insured] to make a determination." See Transcript at 339.

At step two of the sequential evaluation process, the ALJ is required to identify the claimant's impairments and determine whether they are severe. An impairment is severe if it has "more than a minimal effect on the claimant's ability to work." See Henderson v. Sullivan, 930 F.2d 19, 21 (8th Cir. 1992) [internal quotations omitted]. The determination at step two is strictly a medical determination. See Bowen v. Yuckert, 482 U.S. 137 (1987).

Between steps three and four of the sequential evaluation process, the ALJ is required to assess the claimant's residual functional capacity, which is a determination of "the most a person can do despite that person's limitations." See Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record and must be supported by "medical evidence that addresses the claimant's ability to function in the workplace." See Id. at 539.

The ALJ characterized Jordan's mental impairments as depression and mild mental retardation and considered them "singly and in combination. See Transcript at 15. He found at step two that they are not severe impairments because they do not cause more than a minimal limitation of her ability to perform work-related activities. He so found because of inconsistencies in the record, specifically noting the following:

> … The claimant told Dr. Shry that she was incapable of handling her own hygiene and dressing without assistance. … However, on November 7, 2011, in another mental status consultative examination conducted by Peggy J. Foster, MRC and Sam Boyd, PhD, the claimant reported that she cooks, cleans, grocery shops and does laundry unassisted …

> In addition, the examiners could not rule out whether [the claimant] had malingered during the evaluation … While Dr. Shry did not think that the claimant had malingered, he believed that the claimant's symptom allegations were not consistent with her presentation in his evaluation … Dr. Shry stated that [the claimant] was friendly and laughed and smiled through the interview … Those findings significantly lessen the credibility of the allegations regarding the claimant's mental impairments.
>
> … As for the mild mental retardation, Dr. Shry did not do any objective testing with regard to [the claimant's] IQ level … Dr. Boyd and Ms. Foster did perform IQ testing that showed [the claimant's] IQ to be in the mild mental retardation range, but they did not consider her testing to be valid due to apparent visual problems and possible malingering … In addition, the claimant's educational history, developmental history, and level of adaptive functioning were not consistent with mental retardation …

See Transcript at 15.[3]

The ALJ then assessed Jordan's residual functional capacity and found that she is capable of performing medium work, except that she must avoid moderate exposure to certain environmental irritants and poorly ventilated areas. In making the assessment, he made no mention of any limitations caused by an intellectual disability.

Does substantial evidence on the record as a whole support the ALJ's findings? On the record now before the Court, it cannot be said that substantial evidence on the record as a whole supports his findings regarding Jordan's intellectual disability and its affect on her ability to perform work-related activities. The Court so finds for two reasons.

---

[3]

The ALJ also considered Brown's opinion but accorded it less weight than the opinions of Shry, Foster, and Boyd because Brown's opinion was "not entirely consistent with the medical evidence from the treating and examining providers" and they had "evaluated the claimant in person." See Transcript at 16.

First, the ALJ appears to have improperly rejected Shry's opinion.[4] The ALJ rejected Shry's opinion, in part, because he observed that Jordan's "symptom allegations were not consistent with her presentation in his evaluation" and because she was "friendly and laughed and smiled through the interview." See Transcript at 15. It is true that Shry made those observations, but he nevertheless opined that his assessment of mild mental retardation was a valid and reliable indication of her intellectual and adaptive functioning. The ALJ also rejected Shry's opinion because he did not perform any "objective testing with regard to [Jordan's] IQ level." See Transcript at 15. It is true that Shry did not perform WAIS testing, but his opinion is nevertheless entitled to some weight. He never represented that his assessment was made on the basis of objective testing; he simply offered his estimation of her intellectual functioning.

Second, notwithstanding the foregoing, there is evidence in the record that Jordan has an intellectual disability, and the evidence cannot be ignored. Admittedly, she did not allege that she became disabled and unable to work as a result of an intellectual disability, and she made no representations in her disability documents about such a disability. Nevertheless, three medical professionals found, at least preliminarily, that she has some level of impaired intellectual functioning. The ALJ, though, rejected Shry's opinion and the WAIS testing scores obtained by Foster and Boyd. Having done so, the

---

[4]

Any medical opinion may be discounted or even disregarded if other medical opinions are supported by better or more thorough medical evidence or if a medical professional renders inconsistent opinions that undermine his credibility. See Choate v. Barnhart, 457 F.3d 865 (8th Cir. 2006).

question remained: what is Jordan's level of intellectual functioning, and what affect does it have on her ability to perform work-related activities? The ALJ appears to have answered that question in the following manner: "[Jordan's] educational history, developmental history, and level of adaptive functioning were not consistent with mental retardation." See Transcript at 15. The Court is not persuaded that his finding alone is an adequate assessment of her intellectual disability and its affect on her ability to perform work-related activites.

The evidence of Jordan's educational history, developmental history, and level of adaptive functioning is conflicting and an inadequate basis alone for making an assessment of her intellectual functioning. There is evidence she only completed the sixth grade and required special education classes beginning in elementary school. Although it is not clear what was meant by her "developmental history," it is worth noting that the evidence concerning her work as a cashier was not a model of clarity. There is evidence she only worked briefly as a cashier and, when she did, required help in doing the work. The evidence of her adaptive functioning is also conflicting. Shry's findings indicate that Jordan has some limitations in her adaptive functioning. In short, although her educational history, developmental history, and level of adaptive functioning are factors to be considered, additional medical testing would be beneficial.

The ALJ has an obligation to fully and fairly develop the record. See Battles v. Shalala, 36 F.3d 43 (8th Cir. 1994). The obligation exists even if the claimant is represented by counsel during the administrative hearing. See Boyd v. Sullivan, 960 F.2d

733 (8th Cir. 1992).[5] There is no bright line test for determining whether the ALJ fully and fairly developed the record; the determination is made on a case-by-case basis.  See Battles v. Shalala, 36 F.3d at 45.

The Court finds that the ALJ failed to fully develop the record with respect to Jordan's intellectual functioning and the affect it has on her ability to perform work-related activities. A remand is therefore necessary. Upon remand, the ALJ shall re-evaluate the evidence and, as a part of doing so, send Jordan for another consultative examination to determine her level of intellectual functioning and what affect it has on her ability to perform work-related activities.

The Commissioner's decision is therefore reversed, and this case is remanded. The remand in this case is a "sentence four" remand as that phrase is defined in 42 U.S.C. 405(g) and Melkonyan v. Sullivan, 501 U.S. 89 (1991). Judgment will be entered for Jordan.

IT IS SO ORDERED this 6th day of July, 2015.



_____
UNITED STATES MAGISTRATE JUDGE

_____
5

"This is so because an administrative hearing is not an adversarial proceeding. ... '[T]he goals of the [Commissioner] and the advocates should be the same: that deserving claimants who apply for benefits receive justice.'" See Wilcutts v. Apfel, 143 F.3d 1134, 1137-1138 (8th Cir. 1998) [quoting Battles v. Shalala, 36 F.3d at 44].